| | | |
|---|---|---|
| **DYVEX INDUSTRIES, INC.,** | : | |
| **Plaintiff,** | : | **Civil No. 12-CV-0979** |
| **v.** | : | **(JUDGE MANNION)** |
| **AGILEX FLAVORS &** | : | |
| **FRAGRANCES, INC., et al.,** | | |
| | : | |
| **Defendants** | | |

## <u>MEMORANDUM</u>

Pending before the court is the motion for summary judgment of defendants Agilex Flavors & Fragrances, Inc., Aromatic Technologies, Inc. and Aroma Tech (collectively referred to as "Agilex"), (Doc. 106), based upon the spoliation of evidence by plaintiff Dyvex Industries, Inc. ("Dyvex"), in this product liability case. Dyvex alleges that Agilex's defective Perfectly Pomegranate Gras Oil ("PPG") polymer fragrance oil caused a fire destroying its facility. Agilex argues that Dyvex failed to preserve the area of the fire's origin. Agilex seeks summary judgment with respect to all of Dyvex's remaining claims as relief. Alternatively, Agilex seeks the court to give an adverse "spoliation inference" jury instruction at trial. The motion has been fully briefed by the parties. Based upon the court's review of the motion and related materials, the court will **DENY** Agilex's motion insofar as it seeks the dismissal of Dyvex's remaining claims, and it will **GRANT** the motion insofar as Agilex seeks a jury instruction at trial regarding the spoliation inference.

## I. BACKGROUND[1]

The remaining claims raised by Dyvex in its complaint, (Doc. 1), against Agilex are for negligence, breach of contract, breach of warrant, and strict liability.[2] Agilex formulates fragrance oils that are used in products such as air fresheners and personal care products. Agilex supplied fragrance oil to Dyvex for use in Dyvex's polymer fragrance concentrate products. Dyvex basically alleges that Agilex's PPG fragrance oil was defective and created an unreasonable risk of fire, and that the June 3, 2010 fire at its facility was caused by Agilex's PPG that was being processed at the time. Dyvex also alleges that the PPG was unsafe and unsuitable for use in its Buss-Kneader machine, and that Agilex failed to warn it of the PPG's dangers, including its 93 degree flash point.

On April 3, 2017, Agilex filed its motion for summary judgment based on spoliation. (Doc. 106). Agilex simultaneously filed its brief in support of its motion. (Doc. 107). After an extension of time, Dyvex filed its brief in opposition on May 3, 2017. (Doc. 118). Agilex then filed its reply brief on June 2, 2017. (Doc. 134). The court granted Dyvex's request to file a sur-reply brief

---

[1]Since the court recently stated the background of this case in its February 12, 2018 Memorandum, granting Agilex summary judgment with respect to Dyvex's claim for punitive damages, Count V, it shall not fully repeat it herein. (Doc. 152).

[2]Because this is a case based upon diversity jurisdiction, 28 U.S.C. §1332, the court applies Pennsylvania law. *See* Moore v. Kulicke & Soffa Industries, Inc., 318 F.3d 561, 563 (3d Cir. 2003).

which it did on June 7, 2017. (Doc. 137). The parties attached exhibits to their briefs.

## II.    DISCUSSION[3]

Agilex's motion for summary judgment is premised on two alleged acts of spoliation of evidence by Dyvex. First, it argues that Dyvex failed to preserve the fire scene prior to allowing its representatives to examine it. Second, it argues that Dyvex failed to preserve all of the items its experts designated for preservation during the joint inspection of the scene.

Spoliation applies if the evidence in question is within the party's control and there has been an actual suppression or withholding of the evidence. "No unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for." Brewer v. Quaker State Oil Revining Corp., 72 F.3d 326, 334 (3d Cir. 1995).

The court in Community Ass'n Underwriters of America, Inc. v. Rhodes Development Group, Inc., 2013 WL 818596, *5 (M.D.Pa. March 5, 2013) explained spoliation as follows:

> Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence

_____

[3]The court does not repeat the standard for a summary judgment motion which was stated in its February 12, 2018 Memorandum, (Doc. 152), and the standard is incorporated herein by reference.

3

in pending or reasonably foreseeable litigation." Indemnity Ins. Co. of N. America v. Electrolux Home Prods., 2011 U.S. Dist. LEXIS 140911, *11, 2011 WL 6099362 (E.D.Pa. Dec. 7, 2011). A party that reasonably anticipates litigation has a duty to preserve relevant evidence. Baliotis v. McNeil, 870 F.Supp. 1285, 1290 (M.D.Pa. 1994). Where evidence is destroyed, sanctions may be appropriate, including the outright dismissal of claims, the exclusion of countervailing evidence, or a jury instruction on the "spoliation inference." Howell v. Maytag, 168 F.R.D. 502, 505 (M.D.Pa.1996). The "spoliation inference" instruction permits the jury to assume that "the destroyed evidence would have been unfavorable to the position of the offending party." Id. (quoting Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 78 (3d Cir. 1994)). The appropriate sanction will depend on the facts and circumstances of the case. Schmid, 13 F.3d at 81. The court should "select the least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim." Id. at 79 (quoting S.D.I. Operation P'ship L.B. v. Neuwirth, 973 F.2d 652 (8th Cir. 1992)).

See also Bull v. United Parcel Serv., Inc., 665 F.3d 68, 73 (3d Cir. 2012)(citation omitted) ("Spoliation occurs where: the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party.").

As such, Agilex's motion seeking sanctions against Dyvex for spoliation must be considered based on the following three factors: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." Schmid, 13 F.3d at 79; see also Schroeder v.

4

Department of Transportation, 551 Pa. 243, 710 A.2d 23, 27 (1998). Additionally, "[i]n determining the applicability of the spoliation doctrine, a court cannot focus on only one prong of the test, but must balance the facts of the case involved as to each prong." Tenaglia v. Proctor & Gamble, Inc., 737 A.2d 306, 308 (Pa. Super. 1999).

"In the spoliation analysis, '[f]ault has two components: responsibility, and the presence of bad faith.'" Community Ass'n Underwriters of America, 2013 WL 818596, *5 (citation omitted). There is no suggestion that Dyvex acted in bad faith. Rather, Agilex argues that the fire scene was in Dyvex's complete control, the evidence was not properly preserved and it was not given the opportunity to examine it before it was altered, and that Dyvex was responsible for the alteration and destruction of evidence after the fire.

Regarding the responsibility component, "a party to a lawsuit, and its agents, have an affirmative duty to preserve relevant evidence where a plaintiff knows that litigation against a defendant is likely, and it is foreseeable that discarding the evidence would be prejudicial to the defendants." Id. at *6. It makes no difference "whether the plaintiff is an insured or an insurer pursuing a subrogation claim." Id. Further, "[a] party suffers irreparable prejudice where the other party impairs their 'ability to present a defense on the merits.'" Capogrosso v. 30 Rivert Court E Renewal Co. 482 Fed.Appx. 677, 682 (3d Cir. 2012) (citation omitted).

In its strict liability claim, Dyvex alleges that Agilex is liable "by

5

defectively formulating, producing selling and distributing the [PPG] fragrance oil." Since a plaintiff in a design defect case must show both a design defect and that the defect caused its injury, "the defendant will want as much information as possible relevant to the issue of causation." Schmid, 13 F.3d at 80.

Agilex filed the instant motion claiming that Dyvex and its officials failed to preserve the evidence at its facility after the fire, thus prejudicing Agilex's defense of this case.

On June 3, 2010, the Pennsylvania State Police Fire Marshal and troopers inspected Dyvex's facility after the fire. The Fire Marshal took photos of the fire scene and spoke to Dyvex's owners, Robert Strony and Joseph Depoti. At his October 2013 deposition, Strony testified that the Fire Marshal rubbed the top of a drum and said that this is where the fire started and "There's your problem." He had to rub the top of the drum to remove the soot on it to show Strony the label and pointed to the flash point. When Strony was asked at his deposition whether the drum was "open and being used at the [kneader] machine or [whether it] is that one of the Perfectly Pomegranate drums that had not yet been opened", he stated "**It was a drum that was not yet opened**." (emphasis added). Strony then acknowledged that the stated "drum of oil was not being used by Dyvex to process any materials." (Doc. 134-2).

On June 4, 2010, Alex Profka was retained by Nationwide Mutual

Insurance Company ("Nationwide") and its loss adjuster, James Williams, to investigate Dyvex's fire loss as well as the fire cause and origin.[4] Profka took photos of the fire scene, which included photos of the three PPG drums. Williams stated that Profka was responsible for securing the fire scene and preserving the evidence. And Profka testified that he told Strony and Depoti not to move anything at the fire scene and "to secure the scene", i.e., "the whole building", which meant for them to lock it up so nobody could get in there. Profka stated that he did not return to the Dyvex facility after June 4.

Profka's directive to Strony and Depoti was in conformance with NFPA 921-2008, the applicable standard at the time of the fire, which indicated that "[p]hysical evidence at the fire scene may be relevant to the issues of cause, spread, or the responsibility for the fire", and that "[e]very attempt should be made to protect and preserve the Fire scene as intact and undisturbed as possible, with the structure, contents, fixtures, and furnishings remaining in their pre-fire locations."

Despite Profka's instructions, Agilex contends that the "fire scene was disturbed, corrupted and destroyed [by Dyvex's employees], and that "literally tons of evidence was hauled away to a landfill before [Agilex was] given the opportunity to investigate th[e] fire." Agilex's evidence shows that Profka's photos indicate that the items in Dyvex's facility were still present and that

---

[4]Agilex indicates that Nationwide is pursuing a subrogation claim in this case.

sometime prior to the scene inspection by parties on July 29, 2010, the items had been removed, demolished, or disposed of. Agilex additionally contends that "critical components of the subject Buss-Kneader machine were discarded as well as other key evidence such as drums of material, delivery vessels, piping, raw materials, documents and finished product that was present in the area where [Dyvex's] alleged the fire originated."

Moreover, Agilex's evidence includes a June 10, 2010 proposal from Wallis Electric Construction Company for the amount of $68,000.00, "for total demolition and cleanup of fire damaged building", and an invoice with the same date from Wallis requesting payment for "all machine work with operators, laborers, and approx. 13 tons of debris in dumpsters hauled to landfill." Paladin Adjustment Group's photographs dated June 20, 2010, showed storage shelves with a lot of stored materials inside the Dyvex building and, liquid containers and 55 gallon drums stacked outside the facility. Despite the photos indicating that items were already removed from inside the facility to outside, Dyvex's attorney sent a letter to Agilex on June 25, 2010 notifying it of a possible subrogation claim, and advising it that the fire scene was being preserved and was available for examination.

On July 9, 2010, Dyvex's attorney sent another letter to Agilex stating that the fire scene was being preserved, and that the scene would be preserved until July 14, 2010, when demolition was scheduled. However, on the same date as the letter, an investigator from Insight Investigations, Inc.

went to the Dyvex facility to examine and document the interior and exterior of the building. Insight's report indicates that men were working with heavy machinery, skid steer loaders, to "clean up the fire" scene, and its photos and video show that the interior and exterior of the building were disturbed, including the fire scene.

Agilex contends that the above evidence contradicted the representations of Dyvex's attorney that the fire scene was still being preserved.

On July 29, 2010, Agilex's expert Thomas Long arrived at Dyvex for the joint inspection and he performed an inspection of the scene. At this time, the drums and the items in the shelving depicted in the June 20, 2010 Paladin photos were removed from the building and Long could not inspect them. Also, a lot of materials were stacked up outside the building, and it appeared that a lot of clean up had occurred inside the building. Each representative at the joint inspection were told to put tags on any items they wanted preserved. Long put nine tags on items, including the Buss-Kneader machine, and took photos.

Agilex contends that the undisputed evidence shows that the physical evidence involved in the fire, including the area of the alleged origin of the fire, was not preserved by Dyvex and key evidence was lost which prevented it from conducting a proper analysis. Agilex states that the evidence shows the fire scene was not preserved before it was first given notice on June 25, 2010.

9

In his expert report, Long opined, in part, as follows:

> Plaintiff spoliated the fire scene and violated the guidelines set forth in NFPA 921 [the accepted industry guide for investigating fires] prior to allowing other interested parties to examine, document, and analyze the fire scene and, therefore, prevented a complete and thorough investigation that follows the scientific method and the guidelines published in NFPA 921.
>
> Plaintiff spoliated the fire scene and disposed of key evidence necessary to evaluate all developed fire cause hypotheses.

Long also stated that Dyvex should have preserved the entire Buss-Kneader machine and the equipment that was connected to and/or operated with it.

Agilex also retained Caulfield Engineering to prepare an expert report. Dr. Caulfield echoed Long's findings that several systems and components that were connected to the Buss-Kneader machine were "disassembled and discarded" and that there were only limited photos of the components after the initial fire scene photographs. Caulfield also opined as to how the failure to preserve evidence effected his investigation, such as showing whether there were any problems with the Buss-Kneader machine as well as the connections of the components and the systems to the machine at the time of the fire, including the oil transfer/pumping/weighing system. Significantly, he indicated that the evidence would have shown what fragrance oil was being injected into the machine at the time of the fire.

Both of Agilex's expert detailed a list of the components and systems that should have been preserved in order to permit a proper investigation of

10

the fire scene with respect to determining cause and origin. In particular, Agilex contends that Dyvex "failed to preserve the drums of materials closest to the [ ] Buss-Kneader machine, preventing a definitive determination of what may have been being processed at the time of the fire." Additionally, Agilex argues that Dyvex failed to preserve other critical pieces of evidence, including "the pump feed system that supplied the fragrance oil to the subject Buss-Kneader, the bucket and pot used for transferring the fragrance oil to the feed system, the underwater pelletizer system, and the barrel from which the PPG was allegedly dispensed."

Agilex states that its evidence shows "the scene was not preserved prior the first notice given to Agilex on June 25, 2010" and that the scene was "knowingly and intentionally disturbed, corrupted and destroyed." Indeed, the photos of the fire scene submitted by Agilex show that the metering pump, transfer bucket and pot, and the 55 gallon drum of fragrance oil that was supplying oil to the Buss-Kneader at the time of the fire were all removed from Dyvex's facility by its officials before Agilex inspected them. Agilex also argues that it should have been advised by Dyvex that evidence was going to be discarded and/or destroyed between the time of the first scene inspection on July 29, 2010 and the time of a second scene inspection on September 23, 2010. It also notes that Dyvex and its officials were "in control of the scene at all times and responsible for preservation of all evidence."

Agilex states that it is "significantly prejudiced" by "[Dyvex's] destruction

of the pump systems, delivery vessels, bucket and pot used for transferring the fragrance oil to the feed system, the underwater pelletizer system, and the barrel from which the PPG was allegedly dispensed as this evidence is [ ] potential alternative cause[s] of the fire at issue." Without this relevant evidence of other possible alternative causes of the fire and other factors, besides its PPG, which may have contributed to causing the fire, Agilex states that it is unable to "successfully and definitively rebut" Dyvex's claims, including its product liability claim which involves the component parts of the kneader machine which allegedly was the origin of the fire.

Agilex contends that in light of the willfulness of the destructive act as well as the prejudice it has suffered in its ability to defend this case, the gravest sanction of dismissal of Dyvex's remaining claims should be imposed by the court. Alternative, Agilex request the court to give the jury the spoliation adverse inference instruction.

Dyvex argues it satisfied its duty to preserve evidence after the fire on June 3, 2010, to the time of the joint fire scene examination on July 29, 2010, and that it left the fire origin area around the kneader machine "completely untouched." It states that its "salvage and mitigation activities were far away from the kneader area." At the time of the initial joint examination, Dyvex states that Agilex had the chance to put evidence tags on all evidence it wanted saved, and that all nine items Agilex tagged were preserved by Dyvex. Also, on September 23, 2010, a joint scene examination was held and only

the items tagged on July 29 were present. Long attended this examination on behalf of Agilex. Dyvex states that it preserved all items Long tagged. Dyvex contends that Agilex cannot now complain that other items Long failed to tag were not preserved. Dyvex states that the undisputed evidence shows that the area of the fire origin was at the Buss kneader machine, and that its entire 15,625 sq.ft. building was not the "fire scene" that had to be preserved. Nonetheless, Dyvex secured its building as Profka directed it to do. Dyvex also points out that it presented evidence to show that it was processing Agilex's PPG at the time of the fire and that the flashpoint of this oil was 93° F., a level considered to be flammable, despite Agilex's contentions that there is insufficient evidence to show that its PPG was being processed at the time and that the flashpoint of its PPG oil was 103° F., an acceptable level.

It is undisputed that on July 29, 2010, a joint inspection of the fire scene at Dyvex's facility occurred. Dyvex states that at the time of the inspection, the evidence shows that the area around the kneader machine was "untouched after June 4." Also, those attending the inspection were told to designate whatever evidence they wanted to be preserved, and Agilex's expert, Long, tagged only nine items and he also recorded the list of tagged items and their descriptions in his handwritten notes. Long was free to tag whatever item he wanted saved. Dyvex maintains that the list of items in Long's notes are much narrower than the list of items, mentioned above, which he contends in his report would have assisted in determining the cause of the fire.

13

Long's Tag #4 was specifically listed as "extruder" and Dyvex saved it. However, in his March 27, 2015 report, Long indicates that Tag #4 was descried as "The Buss kneader with its components including the motors and pumps attached." In his report after a re-inspection at Dyvex on June 5, 2014, Long indicated that "The items stored . .. included the Buss kneader, minus the pumps and other appurtenances used to pump fragrance oil into the Buss kneader. .." Long further indicated that other items he did not tag were also not saved, including "the horizontal drum and the three adjacent upright drums of unknown liquid" as well as "the oil transfer/pumping/weighing system." Nor did Long tag the feed stock system, the oil injection system or the underwater pelletizer system. Long testified that the word "extruder" on Tag #4 also meant to include items that were "part of the extruder operation" since they were associated with it or connected to it.

Dyvex argues that Long should have tagged "every individual item he wanted saved and thereby eliminate all doubt or ambiguity." In fact, Dyvex states that Long tagged the drum of PPG it claims was being processed at the time of the fire, but that since Long did not tag the drum laying horizontal at the scene, which drum Agilex now contends was being processing at the relevant time, Dyvex did not save it. Further, since Long did not tag the transfer bucket, pot and scale near the kneader machine, Dyvex did not save them. Dyvex states that these items, as well as other items which Agilex now contends were not preserved, were not part of the kneader machine and were

14

used with other machines as well.

Dyvex also points out that it sent engineer Michael Zazula to the July 29, 2010 joint inspection as one of its representatives and he averred in his 2015 Affidavit that prior to the inspection, all of the parties were advised that they could identify and designate any items of physical evidence to be preserved.[5] Zazula also states that at the inspection, he asked Long a few times what evidence he wanted preserved, and that at the end of it, again asked Long if he wanted anything else preserved. He states that Long responded "No." Zazula then separated all of the physical evidence designated for preservation by any party, and he preserved every designated item. Any item that was not designated for preservation by a party was not saved. Zazula also disputed Long's assertion that Dyvex failed to save the above stated items he wanted preserved and averred that "[i]f [Long] had tagged additional items, we would have preserved them too."

There is no dispute that a drum of PPG was moved by Strony on June 3, 2010. Dyvex states that after the Fire Marshal arrived on the scene of the day of the fire, Depoti and Strony told him that PPG was being processed in the kneader machine at the time and, that they were told to save the drum.

---

[5]The National Fire Protection Association 921 ("NFPA") provides: "16.2.1. Physical evidence is any physical or tangible item that tends to prove or disprove a particular fact or issue. Physical evidence at a fire scene may be relevant to the issues of the origin, cause, spread, or the responsibility for the fire."

Thus, Dyvex states that Strony moved the drum of PPG in a good faith effort to comply with the instruction of the Fire Marshal. Agilex disputes that the Fire Marshal made a determination that the PPG was the cause of the fire. Dyvex admits that Strony then moved the PPG drum, allegedly being processed at the time of the fire, as well as the two other unprocessed drums of PPG to a more secure location. Subsequently, Dyvex returned the two unused drums of PPG to Agilex. Strony and Depoti averred that they did not move anything in the area of the kneader machine, which Dyvex maintains was undisputedly the fire scene. However, Dyvex states that since some of its customers, including Agilex, had stored materials at its facility, it had to pull those materials from its building to allow another processor to compound them, and to allow them to be inspected for salvage and included in their customer's own possible insurance claims.

Dyvex also addresses Agilex's other evidence upon which it bases its instant motion. Dyvex states that the Wallis proposal was part of the insurance adjustment and that its building was not demolished as evidenced by the fact that a joint inspection of its facility occurred on July 29, 2010. Dyvex also states that the Wallis Invoice was simply "to clear out shipping and receiving area, clear out all aisles, and stack product for inspection for possible salvage" and that this are was not relevant to the origin of the fire. Dyvex indicates that it was only finding out what was salvageable in areas other than where the fire started, and its evidence explains why this was

important to it. Dyvex also explains that the Paladin photos do not show spoliation but show that it did not remove any fire damaged boxes from its building and that the drums which were removed from the building were not damaged indicating that they were not in the area of the fire.

The report of Agilex's other expert, Caulfield, who was not present for the July 29, 2010 joint inspection, indicates that several other untagged items should have been preserved from the fire scene, namely, gravimetric feeding system, transfer bucket and pot, parts of the underwater pelletizer system, drying system, and parts of the process control system. Caulfield avers that he was hindered in rendering an opinion as to causation by Dyvex's failure to save these items. In response, Dyvex states that "Dyvex saved everything Long tagged. Caulfield is hampered by Long's failure to tag items he now wishes he had asked Dyvex to save, and by Long's willingness to take the avoidable risk that Dyvex would interpret the word 'extruder' differently than he did on July 29, 2010 and on March 27, 2015."

Moreover, Dyvex explains that when Profka testified that he told Strony and Depoti to secure the scene meaning "the whole building", he meant for them to lock it up to prevent trespassers for liability purposes so nobody would be injured in it. Dyvex states that Profka did not mean that Strony and Depoti were to preserve everything in the building for evidentiary purposes. In his deposition, Profka stated that he told Strony and Depoti "don't touch a thing" in the fire scene area, i.e., "[do] not move anything", and to "leave it as

17

it is" for further investigation. By telling Strony and Depoti to secure the scene, Profka "meant the whole building" and, that he "imagine[d] they would have locked it up, not to let anybody get in there, because there would have been liability issues." At that point, Agilex states that it was Strony and Depoti's duty to preserve the scene. Thus, Agilex states that Profka's main concern with securing the building was evidence preservation and not simply for preventing trespassers for liability purposes. Profka's testimony as a whole supports Agilex's contention. Further, Agilex states that Profka did not know that Strony had already moved a drum in the fire scene area after the PSP were there on June 3, 2010, before Profka arrived on June 4. Specifically, in Strony's June 15, 2015 Affidavit, he averred as follows:

> No one was allowed in the building during the Fire Marshal's investigation. At some point [the Fire Marshal] asked us to enter the building. The Fire Marshal asked what we had been processing. We described the process and showed him the drum of PPG that was being processed. He inspected the label, reacted strongly to the flash point and said we should save the drum. I stood the drum upright from the drum dolly. An "X" with a circle around it was then put on the drum. I moved the drum from where it was to a safer place near the kneader.

Agilex states that "[t]he entire fire scene is evidence, and the failure to save the fire scene constitutes spoliation." It maintains the Strony admitted to altering the fire scene.

Agilex also contends that Dyvex "cannot explain why there are 2 drums with 'Xs' placed on them" and that Stony's averment regarding the "X" "is inconsistent with the evidence in that the earliest photographs [taken by the

Fire Marshal] of PP[G] Drum 3 show the drum in the vertical position, not on a dolly, not horizontal, with no 'X' in a circle on it, and with drop down debris on the label that could only occur if the drum were upright during the fire." Long opined that if the drum was in fact in the vertical position, this would be "consistent with PP[G] Drum 3 being upright and not in use during the fire." This would be significant evidence to refute Dyvex's theory that the stated drum was being processed at the time of the fire. Agilex also states that "Strony's statements in his sworn affidavit are not consistent with the facts in evidence or his own sworn deposition testimony" which is detailed above.

Moreover, Agilex states that Dyvex "relies upon an 'X' on a blue drum of PPG oil with a circle around it to prove that this was the oil that was being run that night" but that, "Strony's 'new' version of events [in his June 2015 Affidavit], more than a year after his lengthy deposition, that conflicts with the version of events as relayed [Manchio], is completely contradicted by the photographic evidence and testing detailed by defense experts Long and Caulfield."

Agilex also points out that in his report, Long stated that "at the time of the Zazula/Nationwide inspection [which was after Profka's inspection and before Long's inspection], not only had PP[G] Drum 3 been marked with an 'X', so had Mochadoodle [gras oil] Drum 2." Further, Agilex states that in his notes after his site inspection on June 4, 2010, Profka indicated that he was probably given information about the two fragrances oils regarding the fire,

including Mochadoodle gras oil, from Strony or Depoti, but he could not remember if they said to him "that they were running Perfectly Pomegranate and Mochadoodle gras oil on the night of the fire." Nor did Profka remember why they would have told him about Mochadoodle gras oil. As such, Agilex states that "Profka deliberately and, in violation of NFPA and industry standards, improperly destroyed his field notes that would have contained relevant and valuable information in this regard to [its] defense of [Dyvex's] claims" and, that this prejudice also requires the dismissal of Dyvex's claims.

Thus, Agilex concludes that the following additional pieces of evidence "confirm [that] there are no genuine issues of material fact in this case:

> First, the State Police Fire Marshal, Trooper Russell Andress, denied under oath ever making a determination that the cause of the fire was PPG oil as stated by Mr. Strony in his new affidavit. Second, the blue drum of PPG oil with an "X" marking was conclusively determined to have not been lying on its side at the time of the fire through burn testing and analysis of the burn pattern on the drum. (See Supplemental Reports of Long and Caulfield [ ].) Third, there is another blue drum with an "X" with a circle around it, Mochadoodle Gras with a flash point greater than 200 degrees, which [Dyvex] can't explain, and which completely contradicts [its] theory in this case that the flash point of PPG was "too low."

Additionally, Agilex requests the court to strike the 2015 Affidavits of Strony and Depoti as "sham affidavits" offered after their deposition testimonies to unilaterally try and change facts they previously swore to in order to defeat summary judgment. Alternatively, Agilex seeks the court to allow it to conduct additional discovery and to re-depose them. "A sham

affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment." It's Intoxicating, Inc. v. Maritim Hotelgesellschft mbH, 2015 WL 1275348, at *2 (M.D.Pa. Mar. 19, 2015) (quoting Jiminez v. All-American Rathskeller, Inc. 503 F.3d 237, 253 (3d Cir. 2007)). "A sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant." Id. Thus, "if it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate." Id. Although the sham affidavit doctrine allows the court to disregard an "affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony", Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004), "not all contradictory affidavits are necessarily shams[,]" Jiminez, 503 F.3d at 254 (citing Baer, 392 F.3d at 625), and "an affiant has the opportunity to offer a 'satisfactory explanation' for the conflict between the prior deposition and the affidavit." Id. (citation omitted). Further, disregarding statements in an affidavit is appropriate only on "clear and extreme facts", such as when the affidavit is "flatly contradictory" to the prior testimony. Coleman v. Cerski, 2007 WL 2908266, at *5 (M.D.Pa. Oct. 4, 2007) (citation omitted).

The court will not strike the Affidavits and it will not permit any further discovery in this 2012 case. If this case proceeds to trial, Agilex will be able to cross-examine Strony and Depoti regarding any alleged inconsistencies between their deposition testimonies and their averments in their 2015 Affidavits. Agilex will also be able to cross-examine Profka and present evidence at trial regarding his notation about Mochadoodle gras oil. Additionally, Agilex maintains that the stated evidence shows no issues of material fact exist. This is certainly evidence that provides Agilex with fertile ground for cross-examination and closing argument, as well as for raising credibility issues for the jury to decide, but the court finds that neither spoliation nor this evidence requires the dismissal of Dyvex's claims precluding its day in court. Such a sanction is too severe under the facts and circumstances of this case in which the court does not find that spoliation was "a direct result of [Dyvex's] malfeasance" as Agilex contends.

Dyvex maintains that it preserved all of the items Agilex, through its representatives (an attorney and two experts), requested, including the following key items: "(1) the allegedly defective Agilex product, namely, all three drums of [Agilex's] PPG; (2) the kneader machine that was [allegedly] processing the PPG at the time of the fire, and (3) the computer equipment associated with the operation of the kneader." Dyvex essentially argues that it cannot be sanctioned based on spoliation since the fault lies for not preserving the stated items squarely with Agilex and its representatives for not

specifically and clearly tagging all of the items they wanted preserved when they had the chance to do so, such as the component parts to the kneader machine.

The court finds that for the most part, Dyvex preserved the area of the fire's origin, including the PPG drum it alleges was being processed at the time and the two other drums of PPG, placed the potentially responsible parties on notice, including Agilex, and then permitted them to inspect the scene and tag all items of evidence they wished to preserve. Dyvex also preserved everything specifically tagged. There was no duty for Dyvex to preserve its entire, large building and all items therein. Nor is Dyvex to blame for failing to interpret what Long claims he broadly meant when he tagged the extruder (i.e., the polymer extrusion machine), Tag #4, despite Agilex's contention that "preservation of the entire manufacturing process is standard operating procedure in the fire investigation community." The court does not find any evidence that Dyvex knew what Long meant and that it deliberately failed to preserve any additional components of the kneader machine. Further, there is no evidence that Agilex's representatives were in any way prevented from tagging, at the July 29, 2010 joint inspection, the items which it now claims were not preserved, such as the pump feed system that supplied the fragrance oil to the kneader machine, the bucket and pot used for transferring the fragrance oil to the feed system, the underwater pelletizer system, and the barrel from which the PPG was allegedly dispensed. While

23

Agilex states that its experts needed to analyze the component parts of the process that was running at the time of the fire, there is no evidence that Long was prevented from more specifically describing exactly what he meant to be saved by his Tag #4.

The undisputed evidence shows that Dyvex was aware litigation was foreseeable when its insurance company, Nationwide, sent Williams to the fire scene the day after the fire, and he arrived with his retained expert, Profka, to determine the cause of the fire. Profka instructed Dyvex's owners to make sure the fire scene and the evidence was preserved. This imposed a duty on Dyvex to preserve the evidence at the scene, and it had the ability to do so since it had exclusive control of the scene. The evidence also shows that Dyvex cleaned up the area around the fire scene and moved some of the evidence without giving any notice or getting the consent of any party who may have had a reasonable interest in it, such as Agilex. "However, the scope of the duty to preserve is not boundless" and, "[g]enerally, there is no blanket rule that plaintiffs must always preserve an entire fire scene." Community Ass'n Underwriters of America, 2013 WL 818596, *6 (citations omitted).

The court in Community Ass'n Underwriters of America, 2013 WL 818596, *6, then addressed the guidelines which the Pennsylvania courts apply in a case like the present one:

> At a minimum, if the plaintiff knows that a particular party is potentially responsible, in the absence of exigent circumstances the plaintiff should provide this party with the opportunity to inspect the evidence. [I]f the plaintiff's investigation reveals that

particular product may be the cause of the fire, the plaintiffs should preserve the product itself. If the investigation reveals alternative potential sources of the fire, these alternative sources should be preserved because they present clearly relevant defense evidence. [But], [i]f, on the other hand, the investigations of the plaintiff and independent experts reveal no alternative sources of the fire the plaintiff may be considered less at fault of failing to preserve the entire fire scene, because there is no clearly relevant defense evidence to preserve.

(quoting Mount Olivet, 781 A.2d at 1271).

Here, the court finds that Dyvex should have preserved the complete kneader machine, as well as the systems and components that were connected to the machine at the time of the fire, including the pump feed system that supplied the fragrance oil to the machine, the bucket and pot that transferred the fragrance oil to the feed system, the underwater pelletizer system, and the barrel containing the oil being used at the time, instead of disassembling and discarding them. The court also finds that there was no reason why Dyvex could not preserve the complete machine with all of its parts and systems in tact. Also, Agilex's experts opine that there could have been sources of the fire other than its PPG which Dyvex alleges was being used at the time. As such, there may have been relevant defense evidence to preserve.

Thus, the issue whether Dyvex's failure to maintain the entire fire scene and its removal of key evidence from the scene as well as the discarding of some of the evidence before Agilex could have its experts examine them is sanctionable.

Strony admits that he removed a drum as well as a pumping and bucket system from the alleged area of origin at the time the PSP Fire Marshal was there, putting the drum by the kneader machine. Thus, the fire scene was partially corrupted before even Profka arrived. Dyvex also disposed of some of the things in the building and moved things in the building after the fire before notifying any interested party that it was doing so. In addition to altering the fire scene, Dyvex unreasonably delayed 22 days before notifying Agilex especially since a representative of Nationwide, the subrogee, and its expert were on the site the day after the fire. As stated, at this point, litigation was reasonably foreseeable triggering Dyvex's duty to preserve relevant evidence.

Thus, Dyvex's conduct amounts to a partial failure to fulfill its duty to preserve all of the potential evidence. No doubt that spoliation did occur. Initially, the court does not find evidence demonstrating that either Dyvex or its officials acted in bad faith. As such, the court will focus on the responsibility component of fault with respect to the spoliation analysis. The court must consider the amount of fault attributable to Dyvex.

Agilex argues that Dyvex failed to maintain the entire fire scene as it was required to do. Agilex states that "[Dyvex] altered, modified and contaminated the tagged kneader machine itself when they disconnected the pump and pumping system that was attached to it in order for it to be discarded." Agilex also states that Dyvex altered "the other critical component parts [which were] systematically removed from the subject kneader

26

machine." Agilex concludes that "[t]his destruction or contamination of evidence that [Dyvex] admits was tagged was not authorized by [Agilex], and was not documented or preserved by photographs or video."

At the outset, the court considers the fact that Dyvex and its officials were in complete control of the fire scene and had exclusive authority with respect to the preservation of evidence. Indeed, no representatives of Agilex were on site at the time any action was taken by Dyvex regarding the fire scene. "Several courts have found that the plaintiff's power to control the scene and to exercise authority over the preservation or destruction of evidence is a relevant factor in determining responsibility." Community Ass'n Underwriters of America, 2013 WL 818596, *6 (citations omitted). This factor increases the amount of fault attributable to Dyvex.

Also, weighing against Dyvex is the fact that immediately after the fire on June 3, 2010, Strony admitted that he moved a drum of PPG. Since Dyvex was aware at that point that Agilex's PPG oil may have been the cause of the fire, Dyvex should have preserved the product, which it did, but it should not have altered the fire scene by moving the drum or anything else near the kneader machine. There is no evidence to suggest that the drum could not have remained in place or that it had to be moved to avoid any additional threat of harm or injury. Leaving the drum in place would have allowed Agilex and its experts an opportunity to observe the fire scene unaltered. Further, at that point, since Dyvex knew that Agilex was a potentially responsible party,

Dyvex should have provided Agilex with notice and the opportunity to inspect the scene without altering any evidence or moving anything, as there were no exigent circumstances requiring any alteration, such as safety hazards. *See* Mount Olivet, 781 A.2d at 1271. However, Agilex was not notified immediately after the Fire Marshal's inspection. Rather, Dyvex did not notify Agilex until 22 days later, after the fire scene was undisputedly altered and potentially relevant material was removed from the building. The court finds that the unreasonable 22-day delay between the date of the fire and the notification of Agilex places Dyvex at a greater degree of fault.

Moreover, the other component parts to the kneader machine which were removed by Dyvex hindered Agilex's ability to try and show alternative potential sources of the fire. In fact, Agilex point to Manchio's testimony "that the kneader machine itself is a conglomeration of pieces that are put together." Agilex states that the experts should have been allowed to analyze the component parts of the kneader since they were part of the manufacturing process that was running at the time of the fire and that this analysis could have revealed other potential factors that could have caused the fire. The court finds that these parts should have been preserved in place as they were immediately after the fire since they were relevant defense evidence. However, Long did not clearly indicate what he meant to be preserved regarding his Tag #4. This fact along with the fact that Dyvex did preserve the kneader machine on-site for examination by Agilex mitigates Dyvex's degree

of fault.

Additionally, there is no evidence that a prompt alteration of the fire scene was necessary in this case, such as a safety risk or an attractive nuisance especially since Dyvex indicates that it made sure the building was locked and secured as Profka instructed. Even though Dyvex states that it moved items in the building and took drums outside so that Agilex and its other clients could still use any of their materials that were salvageable, there was no reason why Agilex was not first given the opportunity to inspect the scene undisturbed and to conduct an exploratory investigation before anything was moved or returned.

On balance, the court finds Dyvex's degree of fault to be relatively high.

The court must now determine the prejudice to Agilex caused by Dyvex's spoliation. Agilex contends that Dyvex's failure to promptly notify it and to give it an opportunity to review the fire scene before any alteration constitutes sufficient fault and prejudice to justify the dismissal of Dyvex's claims, especially since notice would have given it an opportunity to conduct its own investigation and examine all potential causes of the fire.

 "The legal theory a plaintiff advances is relevant to determining the degree of prejudice to the defendant." Community Ass'n Underwriters of America, 2013 WL 818596, *8 (citation omitted). Dyvex's remaining claims against Agilex are for negligence, breach of contract, breach of warrant, and strict liability based on the alleged defective product Agilex provided it, i.e.,

PPG.

To maintain a negligence action, the plaintiff must show that: (1) the defendant owed a duty of care; (2) the defendant breached that duty; (3) the breach caused the injury in question; and (4) resulting damages. Berrier v. Simplicity Mfg. Inc., 563 F.3d 38, 61 (3d Cir. 2009) (citation omitted). As such, Dyvex will have to show, in part, that Agilex's PPG caused the fire to establish its claim.

In Tincher v. Omega Flex, Inc., 104 A.3d 328, 383 (Pa. 2014), the Pennsylvania Supreme Court stated that the non-delegable duty in a strict liability case is "a person or entity engaged in the business of selling a product has a duty to make and/or market the product—which 'is expected to and does reach the user or consumer without substantial change in the condition in which it is sold'—free from 'a defective condition unreasonably dangerous to the consumer or [the consumer's] property.'" (citing Restatement (2D) of Torts §402A(1)). "To demonstrate a breach of duty in a strict liability matter, a plaintiff must prove that a seller (manufacturer or distributor) placed on the market a product in a 'defective condition.'" Tincher, 104 A.3d at 384.

In this case, Agilex argues that it is prejudiced in its ability to defend against essential elements of some of Dyvex's claims. It basically contends that the spoliation prejudices it by hindering its ability to defend against the causation element as well as the defective condition element and to present evidence regarding alterative theories of the cause of the fire, such as the

pumping system. Agilex also states that the alteration of the fire scene by Dyvex has hindered its experts Long and Claufield in their ability to render opinions as to the origin and cause of the fire and hindered their ability to challenge the opinions of Dyvex's experts with respect to the cause of the fire.

No doubt that "it is commonly accepted that a defendant suffers some measure of prejudice if it is precluded from conducting its own independent investigation of a fire scene to determine alternate causes [of the fire]." Community Ass'n Underwriters of America, 2013 WL 818596, *8 (citing Mt. Olivet, 781 A.2d at 1272). Here, the court finds that Agilex incurred prejudice due to the alteration of the fire scene by Dyvex. There are some mitigating factors to reduce the degree of prejudice to Agliex, such as Long's ability to inspect the scene on in July 2010, as well as Dyvex's preservation of all three drums of Agilex's PPG, (one of them being the alleged source of the fire), the kneader machine, and the computer equipment related to the operation of the kneader. However, Dyvex disconnected the pump and pumping system that was attached to the kneader machine and, altered other component parts by removing them from the kneader machine. Strony also moved one of the drums of Agilex's PPG from where it initially was at the scene hindering Agilex's ability to defend against Dyvex's theory that the PPG was being processed at the time of the fire. It was significant that the drum of PPG was moved because this prevented Long from inspecting the drum in its precise position and from seeing where the drum was located at the time of the fire

in relation to the kneader machine which would have allowed him to render a more definitive opinion as to whether the PPG was the cause of the fire. Agilex certainly would have had a stronger defense to Dyvex's claims if its experts could have inspected the scene exactly as it was after the fire. However, this prejudice is mitigated by the fact there were photos by the Fire Marshal and Profka which were relied upon by Long, and upon which Long opines show that PPG drum 3 was not horizontal but vertical indicating that it was not in use during the fire. (Doc. 134-3). Thus, these photos weigh toward mitigating the amount of prejudice suffered by Agilex.

The prejudice to Agilex is also mitigated somewhat since it can "cross-examine[] [Dyvex's] experts and call[] its own experts to render opinions based on [Dyvex's] evidence, or otherwise call into question [Dyvex's] expert's opinions." Id. at *9. As such, based on all of the facts, the court finds that Agilex suffered a moderate amount of prejudice.

The court must now considers the appropriate sanction to impose on Dyvex. "*Schmid* requires that the court weigh the fault and prejudice considerations when applying the appropriate sanction." Id. The court has available three sanctions which it can impose, namely: "(1) a jury instruction on the 'spoliation inference'; (2) the exclusion of Plaintiff's expert report; and (3) the outright dismissal of the claim for which Defendant's position has been prejudiced." Id. Agilex contends that the dismissal of Dyvex's remaining claims is warranted in this case. "The court, however, must 'select the least

onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim.'" Id. (citing Schmid, 13 F.3d at 79). If there is no bad faith by the spoliating party and the prejudice suffered by the other party is not severe, then the court should not enter judgment against the spoliating party as a sanction. Id. Schmid at 81.

In this case, Dyvex was completely responsible for the alteration of the fire scene, which was within its exclusive control, and for the removal of items from the scene and its building prior to notifying Agilex and giving it the opportunity to inspect the site as it existed immediately after the fire. Although some fault lies with Long for not clearly specifying all of the items he wanted preserved with respect to this Tag #4, "extruder", the fire scene had already been altered weeks before the July 29, 2010 joint inspection. Moreover, there is little excuse for Dyvex's 22-day delay in notifying Agilex about the fire since it had reason to believe that Agilex's PPG was a possible cause of the fire the day of the fire when the Fire Marshal was on site, or at the latest by June 4. Further, Agilex was prejudiced, and its ability to present a viable defense was hindered due to the inability to inspect the fire scene unaltered with all component parts and systems of the kneader machine left in tact and with all of the drums of oil left exactly where they were. Dyvex's explanations as to why these items were moved or destroyed do not show any exigent circumstances requiring immediate action before giving Agilex notice and an opportunity to inspect the site in its unaltered state. However, the court has

not seen evidence of bad faith on the part of Dyvex. The level of fault largely lies with Dyvex but the prejudice to Agilex is partially mitigated. As such, based on the facts of this case, the court finds that the harshest sanction of dismissal of Dyvex's remaining claims is not warranted. Rather, the court finds that the lesser sanction of a "spoliation inference" is appropriate. An instruction will be given to the jury that he/she may infer, should he/she choose, that if Agilex defendants were allowed to inspect the fire scene completely unaltered, including the location of Agilex's three drums of PPG as well as the systems and components parts of the kneader machine in tact, this additional evidence from the unaltered scene would have been unfavorable to Dyvex.

## III.    CONCLUSION

Accordingly, Agilex's motion for summary judgment regarding spoliation, (Doc. 106), will be **DENIED** insofar as Agilex seeks the dismissal of Dyvex's remaining claims, and it will be **GRANTED** insofar as Agilex seeks a jury instruction at trial regarding the spoliation inference.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**


**DATE: February 27, 2018**
O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2012 MEMORANDA\12-979-05.wpd