# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DYVEX INDUSTRIES, INC.,** | : | |
| Plaintiff, | : | Civil No. 12-CV-0979 |
| v. | : | (JUDGE MANNION) |
| **AGILEX FLAVORS & FRAGRANCES, INC., et al.,** | : | |
| Defendants | : | |

## MEMORANDUM

Pending before the court is the motion for summary judgment, pursuant to Fed. R. Civ. P. 56(c), of defendants Agilex Flavors & Fragrances, Inc., Aromatic Technologies, Inc. and Aroma Tech (collectively referred to as "Agilex"), (Doc. 101), regarding all of the four remaining claims in the complaint, (Doc. 1), filed by plaintiff Dyvex Industries, Inc. ("Dyvex") in this product liability case. Dyvex claims that Agilex provided it with a defective fragrance oil that caused a fire which significantly damaged its building. Dyvex alleges that Agilex knew or should have known its fragrance oil presented an unreasonable risk of fire, and was unsafe and unsuitable for use in the Buss-Kneader compounding extruder machine for which it was supplied to Dyvex for its production of fragrant plastic pellets. The motion has been fully briefed by the parties. Based upon the court's review of the motion and related materials, the court will **GRANT IN PART AND DENY IN PART** Agilex's motion and, **JUDGMENT** will entered in favor of Agilex only on Dyvex's claim for breach of contract.

## I. BACKGROUND[1]

The remaining claims in Dyvex's complaint against Agilex are for negligence, breach of contract, breach of warranty, and strict liability.[2] (Doc. 1). Dyvex alleges that the fire at its facility "was caused to occur by the culpable conduct of Agilex, ..., in supplying a fragrance oil for Dyvex to incorporate into polymer fragrance concentrate products that Agilex knew or should have known presented an unreasonable risk of fire, and was unsafe and unsuitable for use in the [Buss-Kneader] machine for which it was supplied."[3]

On April 3, 2017, Agilex filed a motion for summary judgment, (Doc. 101), with respect to Dyvex's remaining four claims. Agilex's motion has been briefed by the parties and exhibits have been submitted. (Docs. 102, 113, 130 & 133).

---

[1]Since the court stated the background of this case as well as many of the facts in its February 12, 27 and 28, 2018 Memoranda, it shall not fully repeat them herein. (Docs. 152, 154 & 156).

[2]Because this is a case based upon diversity jurisdiction, 28 U.S.C. §1332, the court applies Pennsylvania law. *See* Moore v. Kulicke & Soffa Industries, Inc., 318 F.3d 561, 563 (3d Cir. 2003).

[3]On February 12, 2018, the court granted Agilex's partial motion for summary judgment with respect to Dyvex's punitive damages claim, Count V, and entered judgment in favor of Agilex on this claim. (Docs. 152 & 153).

## II. DISCUSSION[4]

With respect to all four of Dyvex's remaining claims, Agilex states that it is undisputed that on the night of the fire, its PPG fragrance oil was not being processed by Dyvex in its Buss-Kneader machine.[5] Rather, Agilex states that a drum of unknown fragrance oil was being processed at the time and that the deposition testimony of Manchio, Dyvex's only employee working at the time of the fire, confirmed this fact. Agilex points out that its three 55-gallon drums of PPG were a "significant distance away from the Buss-Kneader machine" and that none of its three drums were laying horizontally at the time of the fire near the machine, which indicates that they were not being used and processed at the time. Manchio testified that while a drum of fragrance oil was being processed "it gets put on a cart on its side and it has a spigot put in." The photos taken after the fire by Profka and the PSP, upon which Agilex relies, show that its three 55-gallon drums of PPG were positioned vertical on the floor and not laying of their side, and they had no spigots in them. Nor were Agilex's drums near the kneader machine.

Further, Agilex states that at the July 29, 2010 joint inspection of the

---

[4]The court does not repeat the standard for a summary judgment motion which was stated in its February 12, 2018 Memorandum, (Doc. 152), and the standard is incorporated herein by reference.

[5]Since the court and the parties are now well-familiar with the abbreviations and the names of the witnesses, the court refers to the abbreviations and the names without referencing what and who they are.

Dyvex's facility, Long tagged Agilex's 3 drums of PPG as follows:

- PPG Drum 1 (Not Processed; 3/4 full): Perfectly Pomegranate Gras Oil Shipping Drum # 1)
- PPG Drum 2 (Not Processed; 3/4 full): Perfectly Pomegranate Gras Oil Shipping Drum # 3)
- PPG Drum 3 (Alleged subject drum that was partially processed; 1/4 Full): Perfectly Pomegranate Gras Oil Shipping Drum # 2)
- PPG Drum 3 was in a vertical position at the time of the fire.

Based on Long's analysis of the post-fire scene, he opined in his report as follows:

1. The area of fire origin was at the [Buss-Kneader machine] located in the northwest rear area of the Dyvex facility.
2. At the time of the fire, Perfectly Pomegranate Gras Oil (PPO) manufactured by Agilex was not being processed in the Buss kneader.
3. PPO played no role in the origin, cause, growth/development, or spread of the fire.
4. At the time of the fire, an unknown liquid was being processed in the Buss kneader. The unknown liquid was not PPO.
5. The three (3) 55-gallon drums of PPO stored at the Dyvex facility at the time of the fire did not contribute to the damage caused to the building or its contents as a result of the fire.

Similarly, Agilex's other expert, Caulfield Engineering, also issued a report and opined as follows:

1. The subject drum on the horizontal stand next to the Buss-Kneader at the time of the fire is not one of the three Perfectly Pomegranate GRAS oil drums manufactured by Agilex.
2. It cannot be determined if the oil in the subject drum was manufactured by Agilex.
3. The fragrance oil being used in the manufacturing process at the time of the fire cannot be determined, but it can be determined that it was not Perfectly Pomegranate GRAS oil.

4

Thus, Agilex contends that Dyvex has presented "no physical, objective evidence to confirm that PP[G] was in fact being processed in the Buss-Kneader at the time of the fire and therefore cannot set forth any evidence that there was a defect in the subject oil and that such defect caused the subject fire." It states that the physical evidence is contrary to Dyvex's allegations as well as the testimony of Manchio who confirmed that "an unknown liquid was being processed from the horizontal drum lying next to the Buss-Kneader." Agilex states that the fragrance oil being processed at the time of the fire "has been conclusively determined NOT to be PPG oil."

**A. Count I, Negligence**

In Count I of its complaint, Dyvex asserts a negligence claim against Agilex. Agilex argues that the negligence claim should be dismissed as a matter of law since Dyvex has not established a prima facie case for this claim.

In order to state a claim for negligence under Pennsylvania law, a claimant must plead the following four elements: "(1) a duty or obligation recognized by the law requiring the defendant to conform to a certain standard of conduct of the protection of others against unreasonable risks; (2) defendant's failure to conform to the standard required; (3) a causal connection between the conduct and the resulting injury; [and] (4) actual loss or damage resulting to the plaintiff." *R.W. v. Manzek*, 888 A.2d 740, 746 (Pa. 2005).

"Generally, to state a cause of action for negligence, a plaintiff must allege facts which establish the breach of a legally recognized duty or obligation of the defendant that is causally connected to actual damages suffered by the plaintiff." Morello v. Kenco Toyota Lift, 142 F.Supp.3d 378, 382 (E.D.Pa. 2015) (citations omitted). No doubt that in Pennsylvania, "[t]he initial element in any negligence cause of action is the first: that the defendant owes a duty of care to the plaintiff", *R.W. v. Manzek*, 888 A.2d 740, 746, and that "[t]he existence of a duty is a question of law for the court to decide." Id. *See also* Hoffman v. Paper Converting Machine Co., 694 F.Supp.2d 359, 368 (E.D. Pa. 2010). "In negligence cases, a duty consists of one party's obligation to conform to a particular standard of care for the protection of another." Manzek, 888 A.2d 746.

In its complaint, Dyvex alleges, in part, that Agilex was negligent in "[f]ormulating, producing, selling and distributing to Dyvex a fragrance oil that it knew or should have known presented an unreasonable risk of fire, and that it knew or should have known was unsafe and unsuitable for use in Dyvex's manufacturing process" and, in "[f]ormulating, producing, selling and distributing to Dyvex a fragrance oil that it knew or should have known had a flash point that was lower and more dangerous than the flash point of previous fragrance oils they submitted to Dyvex for processing of production quantity orders." Dyvex also alleges that Agilex failed to warn it of the actual flash point and the proper flammabiltiy rating for the PPG.

6

Initially, the court finds that Agilex clearly owed a duty of care to Dyvex to provide it with safe fragrance oil to be used in its kneader machine with the appropriate flash point for the process which Agilex knew Dyvex was running. In fact, Agilex does not contend that it did not owe Dyvex a duty of care. Rather, Agilex argues that Dyvex has completely failed to show that Agilex's PPG was being processed at the time of the fire and thus, Dyvex cannot establish the requisite element that its PPG caused the fire.

Dyvex argues that the data obtained from the kneader machine's computer hard drive showed that "two identifying codes [i.e., the "Dyvex number" and the "Control number"] that Dyvex assigned only to PPG had been entered into the computer, and that no subsequent codes for a different fragrance oil were entered subsequently." Dyvex states that "the data from the hard drive prove that Dyvex was processing PPG." Dyvex also states that Strony and Depoti both averred in their Affidavits that Dyvex was processing PPG at the time of the fire, and that other employees of Dyvex, including Manchio, also attested to this fact.[6] Dyvex further states that after the fire, and before the photographs were taken by Profka and the PSP, "PPG Drum 3 was situated horizontally on a drum cart across the operator aisle from the kneader" and, that Strony moved Drum 3 after the fire to save it since he alleges that the PSP fire Marshal identified the drum as the cause of the fire.

---

[6]Insofar as Agilex again seeks the court to disregard the post-deposition Affidavits of Strony and Depoti, (Doc. 130 at 2), the court relies upon its prior ruling in this case to accept the Affidavits.

(*See* Doc. 154 at 15-16, Court's Memorandum regarding spoliation issue). Dyvex points out that its evidence shows that the horizontal drum with the unknown fragrance oil depicted in the post-fire photographs and relied upon by Agilex to support its arguments, was the fragrance oil Dyvex was processing before it switched over to the PPG and, that the PPG was in fact being processed at the time of the fire.

Dyvex also details a timeline of events which allegedly lead to the fire, based on the computer hard drive, in its brief, (Doc. 113 at 5), and shall not be repeated herein. Dyvex also explains as follows:

> The objective hard drive data also corroborates the PPG processing by matching the weight of PPG processed with the time needed to process it, and with the weight of the finished product. The subject kneader operates at a known speed and discharges finished pellets at a known rate. Each fragrance oil is added to the melted raw pellets at a known proportion specified by Agilex. Dyvex has calculated how much finished product the kneader would have produced based on the known parameters, and the figures line up with the start time of approximately 7:00 p.m., the amount of oil remaining in Drum 3, and the amount of finished pellets produced. [ ] In other words, the amount of PPG oil drawn from the Drum 3 was consistent with the hard drive data. The hard drive data does not line up with any other fragrance oil output quantities.

(Id. at 5-6).

Dyvex has also presented evidence to show that Agilex did not warn it of the alleged low flash point for its PPG fragrance oil and that this was the

factual or proximate cause of the fire.[7]

The court finds that there are disputed material facts pertaining to the issue of whether Dyvex was compounding PPG, or some unknown fragrance oil, at the time of the fire. This issue will have to be resolved by the jury at trial. As such, Agilex's motion for summary judgment will be **DENIED** with respect to Dyvex's negligence claim.

### B. Count II, Breach of Contract

Dyvex alleges that the parties entered into a contract in 1999 (i.e., Agreement QP6.2), which imposed a duty on Agilex to provide it with safe fragrance oils for processing, that Agilex breached this duty with respect to its PPG which allegedly had a low flash point, and that Agilex's breach caused it significant damage when the PPG caused a fire in its facility. (*See* Doc. 113-8). Agilex disputes that it ever had a contract with Dyvex and argues that the Agreement does not constitute one.

The elements of breach of contract under Pennsylvania law are: 1) the existence of a contract, including its essential terms; 2) a breach of a duty imposed by the contract; and 3) resultant damages. Core States Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999); Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003). "It is thus axiomatic that there must be

---

[7]As the court previously indicated, the factual issue of whether Agilex's PPG fragrance oil had a low flash point will be for the jury to decide, i.e., Agilex claims that its PPG had a flash point of 103° F., and Dyvex claims that the PPG's flash point was 93° F.

9

a contract to be able to assert a breach of contract claim." *See* United States v. Vantage Trust Federal Credit Union, 2018 WL 306920, Civil No. 17-0348 (M.D.Pa. Jan. 5, 2018).

"The burden of proving the existence of a contract lies with the party relying on its existence." Legendary Art, LLC v. Godard, 888 F.Supp.2d 577, 584 (E.D.Pa. 2012) (citation omitted). As the court in Legendary Art, 888 F.Supp.2d at 585, explained:

> "The elements of an enforceable contract under Pennsylvania law are: (1) a manifestation of an intent to be bound by the terms of the agreement, (2) sufficiently definite terms, and (3) an agreement supported by adequate consideration." Szymanski v. Sacchetta, 2012 WL 246249, at *4 (E.D.Pa. Jan. 26, 2012) (citing Johnston the Florist, Inc. v. TEDCO Constr. Corp., 441 Pa.Super. 281, 657 A.2d 511, 516 (Pa.Super.1995)). The question of whether an undisputed set of facts establishes a contract is typically one of law, but where the facts are in dispute, the question is for the jury to decide. Id. (citations omitted).

Dyvex states that it produced the written contract with Agilex, i.e., the Agreement, and it points to specific language of the Agreement contained in the Policy, Scope and Procedures sections, (Doc. 113 at 10), to support its allegation that Agilex had a duty to supply it with safe fragrance oils. Dyvex also states that "[t]he existence of a contract between Dyvex and Agilex is also demonstrated by the 12+ year course of dealing between the parties" during which "Agilex sent fragrance oils to Dyvex and Dyvex processed them." Dyvex indicates that the dealings between the parties governed by the Agreement were accompanied by written purchase orders. Dyvex also states

that the prior fragrance oils it received from Agilex had flash points of over 130° F., and that while Agilex represented that its PPG had a flash point of 103° F., after the fire, Dyvex found that the PPG's flash point was only 93° F. Dyvex states that based on the long history between the parties it relied upon Agilex's representation that its PPG had a flash point of 103° F.

Agilex argues that the Agreement was not a contract between the parties and there was no "meeting of the minds" between them. It contends that the Agreement was "an internal Quality Control document that Aroma Tech had created for ISO certification." Agilex states that, in his deposition testimony, Strony confirmed that the 1999 Agreement was merely a "processing agreement that was put in place with Aroma Tech, and that "it was related to the ISO certification" that had to be in place with Dyvex regarding Aroma Tech's products produced at their plant. He also stated "with certainty" that the Agreement was "part of the ISO certification that we had to go through." Although Strony stated that "Dyvex was not an ISO-certified facility", "Aroma Tech's products produced at our plant were, because we follow the ISO handbook."

Additionally, Stuart Zlotnik, President of Agilex, testified that he thought the Agreement was "in reference to an ISO certification." Zlotnik also stated that the Agreement was not a contract and that "[i]t's a quality control -- or an ISO 9000 control document." He said that it was "a process document towards an end goal of an ISO 21 certification." However, he stated that

eventually both Dyvex and Agilex decided to "scrap the ISO concept." Indeed, Agilex states that subsequently neither party then complied with the provisions of the Agreement.

The court finds that there was no meeting of the minds between Dyvex and Agilex to enter into a written contract. In viewing Dyvex's evidence in a light most favorable to it, this evidence does not establish the necessary elements of an enforceable contract. *See* Legendary Art, 888 F.Supp.2d at 587 (citing Boyd v. Cambridge Speakers Series, Inc., 2010 WL 2545541, at *5 (E.D.Pa. Jun. 18, 2010) ("Under Pennsylvania law, where the facts are in dispute, the question of whether a contract was formed is for the jury to decide. However, the question of whether an undisputed set of facts establishes a contract is a matter of law."). Thus, the court finds as a matter of law that the undisputed facts in this case do not establish the existence of a contract between Dyvex and Agilex.

As such, Agilex's summary judgment motion will be **GRANTED** with respect to Dyvex's breach of contract claim, Count II.

**C. Count III, Breach of Express and Implied Warranties**

In Count III of its complaint, Dyvex alleges that Agilex breached both express and implied warranties. In its complaint, Dyvex alleges:

> [Agilex] expressly and/or impliedly warranted, pursuant to written and/or oral contracts and/or agreements, that they would formulate, produce, sell and distribute fragrance oils to Dyvex that were suitable for the purpose for which they were furnished, namely, for being incorporated into polymer fragrance concentrate

products at the premises. Dyvex was a direct and/or third-party beneficiary of and to the aforesaid contracts and/or agreements.

The implied warranty of merchantability warrants that goods "are fit for the ordinary purposes for which such goods are used." 13 Pa. C.S. §2314(b)(3). To establish the existence of an implied warranty of fitness for a particular purpose, the plaintiff must demonstrate that "(1) the seller had reason to know of the particular purpose for which the buyer is purchasing the product and (2) the seller knows that the buyer is relying on its skill and judgment to furnish the proper good." 13 Pa. C.S. §2315. To establish a breach of either warranty, "plaintiffs must show that the [product at issue] was defective." Altronics of Bethlehem, Inc. v. Repco, Inc., 957 F.2d 1102, 1104-05 (3d Cir. 1992). "One way to demonstrate a defect is by the submission of circumstantial evidence." Id. (*citing* Greco v. Bucciconi Engineering Co., 407 F.2d 87. 89-90 (3d Cir. 1969)). Breach of implied warranty claims are permissible if based on a claim for manufacturing defect, but not for theories of design defect or failure to warn. Tatum v. Takeda Pharmaceuticals North America, Inc., 2012 WL 5182895, at * 3 (Oct. 19, 2012 E.D. Pa).

"Express warranties, as distinguished from implied warranties, do not independently arise by operation of state law." Bentzley v. Medtronic, Inc., 827 F.Supp.2d 443, 454 (E.D.Pa. 2011). "Pennsylvania law provides that an express warranty is 'specifically negotiated,' Goodman v. PPG Indus., 849 A.2d 1239, 1243 (Pa.Super.Ct.2004), and 'is created by a seller through '[a]ny affirmation of fact or promise made by the seller to the buyer which relates to

13

the goods and becomes part of the basis of the bargain.'" McLaughlin v. Bayer Corporation, 172 F.Supp.3d 804, 822 (E.D.Pa. 2016) (citations omitted). As such, "the parties, not the state, 'define[ ] the substantive obligations of the contract and hence any express warranties.'" Id. (citations omitted).

Agilex simply argues that since Dyvex has failed to show that it was processing PPG at the time of the fire, and since its evidence shows that Dyvex was processing an unknown fragrance oil at the relevant time, Dyvex cannot establish that the PPG was defective. Thus, Agilex states that it is entitled to summary judgment on Dyvex's breach of warranty claims.

The court will **DENY** Agilex's summary judgment motion with respect to Dyvex's breach of express and implied warranty claims, Count III, since it has found disputed material facts exist as to what fragrance oil Dyvex was processing at the time of the fire. Dyvex has also produced sufficient evidence to show that Agilex's PPG was defective due to a low flash point even though Agilex's evidence disputes this fact. The jury will decide these issues. With respect to a claim for breach of the implied warranty of fitness for a particular purpose, Dyvex has sufficiently shown that Agilex had reason to know of Dyvex's particular polymer compounding process, and that Agilex had reason to know that Dyvex was relying on its expertise in providing it appropriate fragrance oil.

Based on the above discussion, Dyvex has presented sufficient

evidence with respect to its breach of implied warranty claim based on a manufacturing defect. However, the court notes that, to the extent Dyvex's implied warranty claims are based on claims for design defect or failure to warn claims, they are impermissible.

### D. Count IV, Strict Liability

In Count IV, Dyvex raises a claim based on a theory of strict product liability against Agilex. Dyvex alleges that at the time of the fire, the PPG was in substantially the same condition as when Agilex placed it in the stream of commerce, and that Agilex "is strictly liable in tort for all damages caused by defectively formulating, producing, selling and distributing the [PPG] fragrance oil." Dyvex also alleges that "the defective and dangerous condition of the [PPG] fragrance oil [ ] was the proximate and direct cause of [its] damages ." Dyvex argues that Agilex supplied it with a fragrance oil to be used in its (Dyvex's) polymer compounding process that was defective and created an unreasonable risk of fire. Dyvex also presented evidence to show that it relied upon Agilex to supply it with fragrance oils that had flash points within the appropriate range for its process of producing scented plastic pellets. As such, the crux of Dyvex's strict liability claim is "that PPG was defective for use in a production run on the APC70 kneader [machine] because it had a 93° F. flash point." Thus, Dyvex alleges that the PPG had both a design defect and a manufacturing defect.

As with its arguments pertaining to Dyvex's other claims, Agilex mainly

15

contends that Dyvex has failed to prove that it was processing PPG at the time of the fire. Agilex states that "reasonable minds cannot differ on whether or not PPO was being processed on the night of the fire" and, that "[t]here is no physical evidence to support [Dyvex's] claim that PPG was being processed at the time of fire." Agilex also states that its evidence shows that its PPG was safe for its intended use by Dyvex since its flashpoint was 103° F.

The Pennsylvania Supreme Court in Tincher v. Omega Flex, Inc., 104 A.3d 328 (Pa. 2014), declined to adopt Third Restatement of Torts in the context of design defect cases, and thus, insofar as Dyvex is asserting a design defect strict liability claim, it is pursuant to Section 402A of the Second Restatement of Torts.[8] Also, "the Pennsylvania Supreme Court just recently clarified in Tincher v. Omega Flex, Inc. that, under Pennsylvania law, Section 402A governs only strict liability claims, and that common law negligence claims are subject to a different standard and analysis. Schwartz v. Abex Corp., 106 F.Supp.3d 626, 635 (E.D.Pa. 2015) (citing Tincher, 104 A.3d at 336, 345, 358, 381-83, 384).

---

[8] In Tincher, 104 A.3d at 399, the PA. Supreme Court overruled Azzarello v. Black Brothers Co., Inc., 480 Pa. 547, 391 A.2d 1020 (Pa. 1978), but "declined the invitation to fill the void by simply 'adopting' the Third Restatement [of Torts] formulation" with respect to "the appropriate standard of proof of a [design defect] strict liability claim in Pennsylvania." Thus, "Pennsylvania remains a Second Restatement jurisdiction" in design cases and a strict liability cause of action sounds in tort. Id. at 399-400.

"In a strict products liability action, a plaintiff must show that (1) the product was defective, (2) the defect proximately caused the plaintiff's injury, and (3) the defect existed at the time the product left the defendant's control." Wright v. Ryobi Technologies, Inc., 175 F.Supp.3d 439, 449 (E.D.Pa. 2016) (citation omitted). "A plaintiff pursuing a strict products liability claim must first prove that the product was in a 'defective condition.'" Id. at 449-50. Since it is a strict liability rule, "it applies even if the seller has exercised all possible care in the preparation and sale of the product." Id. at 450. "The injured plaintiff bears the burden of proving that the product was in a defective condition when it left the seller's control." Id. "Because Section 402A is a strict liability rule, the contributory negligence of the plaintiff is not a defense when the negligence consists of merely failing to discover a defect in the product or to guard against the possibility of its existence." Id. "In a strict products liability design defect claim, the plaintiff must establish that the product was unsafe for its intended user." Id. at 452 (citing Phillips v. Cricket Lighters, 576 Pa. 644, 841 A.2d 1000, 1007 (2003)).

In [Tincher, 104 A.3d at 383](), the court stated that the non-delegable duty in a strict liability case is "a person or entity engaged in the business of selling a product has a duty to make and/or market the product—which 'is expected to and does reach the user or consumer without substantial change in the condition in which it is sold'—free from 'a defective condition unreasonably dangerous to the consumer or [the consumer's] property.'"(citing Restatement

17

(2D) of Torts §402A(1)). "To demonstrate a breach of duty in a strict liability matter, a plaintiff must prove that a seller (manufacturer or distributor) placed on the market a product in a 'defective condition.'" Tincher, 104 A.3d at 384. Additionally, "in Pennsylvania, the cause of action in strict products liability requires proof, in the alternative, either of the ordinary consumer's expectations or of the risk-utility of a product." Id. at 401. The alternative test standard of proof is a "composite", i.e., a standard of proof which states the consumer expectations test and the risk-utility test in the alternative. Id. at 402. "[T]he strict liability cause of action theoretically permits compensation where harm results from risks that are known or foreseeable ... and also where harm results from risks unknowable at the time of manufacture or sale ...." Id. at 404-05. Strict liability claims can be premised upon both a "consumer expectations" and a "risk-utility" theory. "[W]hen a plaintiff proceeds on a theory that implicates a risk-utility calculus, proof of risks and utilities are part of the burden to prove that the harm suffered was due to the defective condition of the product." Id. at 407. "Section 402A makes sellers liable for harm caused to consumers by unreasonably dangerous products, even if the seller exercised reasonable care[.]" Covell v. Bell Sports, Inc., 651 F.3d 357, 360 (3d Cir. 2011).

As discussed above and in the court's February 12, 2018 Memorandum, (Doc. 152), the court has found disputed material facts exist regarding the issue of whether Dyvex was processing PPG at the time of the fire. The court

18

also finds that Dyvex has presented sufficient evidence to show that Agilex's PPG was unsafe for its intended use by Dyvex in its kneader machine and its compounding process, i.e., the PPG had a flash point of 93° F., a level considered to be flammable. Although Agilex has presented evidence to dispute Dyvex's evidence, i.e., evidence that it tested the flash point of its PPG oil prior to shipping it to Dyvex and after the fire and, that it had an acceptable flashpoint of 103° F., the jury will have to resolve these issues. Thus, the court will **DENY** Agilex's summary judgment motion with respect to Dyvex's strict liability claim, Count IV.

## IV. CONCLUSION

Accordingly, Agilex's motion for summary judgment, (Doc. 101), will be **GRANTED IN PART** and **DENIED IN PART**. Agilex's motion will be **GRANTED** regarding Dyvex's breach of contract claim, (Count II), and, **JUDGMENT** will be entered in favor of Agilex and against Dyvex on this claim. Agilex's motion will be **DENIED** with respect to Dyvex's negligence claim, (Count I), and with respect to Dyvex's strict liability claim, (Count IV). An appropriate order will issue.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE**: **March 22, 2018**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2012 MEMORANDA\12-979-08.wpd

19